**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TAEMY OH and YONG K. OH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:18-cv-07214 |
| v. | ) | |
| | ) | Honorable Judge Sharon Johnson Coleman |
| OCWEN LOAN SERVICING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**FIRST AMENDED COMPLAINT**

**NOW COME** the Plaintiffs, TAEMY OH ("Taemy") and YONG K. OH ("Yong") (collectively, "Plaintiffs"), by and through their undersigned counsel, complaining of the Defendant, OCWEN LOAN SERVICING, LLC ("Ocwen"), as follows:

**NATURE OF THE ACTION**

1. Plaintiffs bring this action seeking redress for Ocwen's breach of contract, violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq.,* violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227 *et seq.,* violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, and intentional infliction of emotional distress.

2. Plaintiffs' claims arise from Ocwen's attempts to foreclose on Plaintiffs' home without a factual or legal basis. As set forth herein, Ocwen terrorized Plaintiffs for over five years by attempting to steal their family home through deceptive and unconscionable means.

**JURISDICTION AND VENUE**

3. Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1337 as the action arises under the laws of the United States.

1

4.      The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because this action involves citizens of different states and the amount in controversy exceeds $75,000.00.

5.      The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because all of the events or omissions giving rise to the claims occurred within this judicial district.

## PARTIES

7.      Plaintiffs are natural persons over 18-years-of-age who, at all times relevant, owned and resided at the property located at 23118 Lacroix Lane, Plainfield, Illinois ("subject property").

8.      Plaintiffs are elderly individuals of Korean decent.

9.      Plaintiffs are first generation immigrants and speak very limited English.

10.      Ocwen maintains its principal place of business in West Palm Beach, Florida.

11.      Ocwen is a prominent mortgage servicer that services mortgage loans nationwide, including mortgage loans issued to Illinois consumers.

12.      Ocwen does business in Illinois and maintains a registered agent in Illinois.

## FACTUAL ALLEGATIONS

13.      On January 17, 2007, Plaintiffs obtained a mortgage loan ("subject loan") from Washington Mutual Bank, FA ("WAMU"), secured by the subject property.

14.      At all times relevant, the subject property served as Plaintiffs' principal residence.

15.      Pursuant to the terms of the loan, Plaintiffs were obligated to make monthly principal and interest payments in the initial amount of $1,519.34 for 30 years.

16.     The subject loan is an adjustable rate mortgage and the monthly mortgage payments adjust with relevant market rates.

17.     Pursuant to the terms of the subject loan, Plaintiffs were obligated to make the bi-annual real estate tax payments directly to Will County.

18.     Pursuant to the terms of the subject loan, Plaintiffs were obligated to maintain insurance on the subject property.

19.     On October 18, 2012, WAMU assigned the subject loan to Homeward Residential, Inc. ("Homeward").

20.     At the time the subject loan was assigned to Homeward, Plaintiffs were contractually current on the subject loan.

21.     At the time the subject loan was assigned to Homeward, Plaintiffs were current on the real estate tax payments for the subject property.

22.     At the time the subject was assigned to Homeward, Plaintiffs maintained insurance on the subject property.

23.     As soon as Homeward acquired the subject loan, Homeward inexplicably opened an escrow account for the subject loan and treated the subject loan as it was in default. [1]

24.     As a result of the forced-placed escrow, Plaintiff's monthly mortgage payment increased by hundreds of dollars to fund the newly forced-placed escrow account.

25.     The escrow account was presumably opened to hold and fund payments for the real estate taxes and insurance for the subject property.

_____

[1] An escrow account is utilized by mortgage companies as a security measure to ensure that real estate taxes and property insurance premiums are paid (mortgage company becomes the disbursing agent for the real estate tax payments and the insurance premium payments). Once an escrow account is opened, a borrower's mortgage payment increases to account for the real estate taxes and property insurance payments. Escrow accounts are either opened with the consent of the borrower or unilaterally by a mortgage company after a borrower defaults.

26.     Shortly thereafter, Homeward discovered its error in opening an escrow account for the subject loan and closed it.

27.     Per the terms of the subject loan, Plaintiffs continued to pay the real estate taxes directly to Will County and continued to maintain their own insurance on the subject property.

28.     Upon information and belief, Ocwen acquired Homeward through a merger in late 2012, and therefore became the owner of the subject loan.

29.     In April 2013, Ocwen began servicing the subject loan.

30.     At the time Ocwen began servicing the subject loan, Plaintiffs were contractually current on the payments on the subject loan.

31.     At the time Ocwen began servicing the subject loan, Plaintiffs maintained property insurance on the subject property.

32.     At the time Ocwen began servicing the subject loan, Plaintiffs were current on the real estate tax payments for the subject property.

33.     At the time Ocwen acquired the subject loan, Ocwen's records indicated that the subject loan was in default and Ocwen treated it as such.

34.     Shortly after Ocwen began servicing the subject loan, due to Ocwen's erroneous belief that the subject loan was in default, Ocwen unilaterally opened an escrow account for the subject loan.

35.     As a result of the forced-placed escrow account, Plaintiffs' monthly mortgage payment increased by approximately $700.00 to fund the account.

36.     Plaintiffs continued to make their monthly mortgage payment in the approximate amount of $1,599.03, which accounted for the principal and interest payments required by the terms subject loan.

37.     Plaintiffs' monthly mortgage payment in the approximate amount of $1,599.03 did not include the approximate $700.00 that was being charged to fund the forced-place escrow account as Ocwen had no contractual or legal right to open the escrow account.

38.     As a result of the opening of the escrow account, Ocwen started to deem Plaintiffs' monthly mortgage payments as insufficient, therefore increasing the non-existent default on the subject loan.

39.     Moreover, Ocwen began misapplying Plaintiffs' monthly payments. Specifically, Ocwen began holding Plaintiffs' payments in a "suspense account" based on the false premise that the payments were insufficient to cover a full payment.

40.     From April 2013 through at least October 2018, Plaintiffs made every payment that became due pursuant to the terms of the subject loan.

41.     Despite Plaintiffs' timely payments, Ocwen either (1) returned Plaintiffs' payments or (2) misapplied the accepted payments by placing the payments in a "suspense account" until the "suspense account" had sufficient amounts to fund a monthly payment that included a charge for the escrow account that was erroneously opened by Ocwen.

42.     As a result, Ocwen consistently charged erroneous fees to the subject loan, including but not limited to, late fees and property inspection fees, thus increasing the alleged default on the subject loan.

43.     On May 13, 2014, unbeknownst to Plaintiffs, Ocwen unilaterally paid the first installment of the 2013 real estate taxes in the amount of $5,111.75 to Will County, weeks prior to the due date.

44.     Ocwen did not notify Plaintiffs that it paid the first installment of the 2013 real estate taxes to Will County.

45.     On May 30, 2014, Yong went to the Will County Treasurer's Office to make payment for the first installment of the 2013 real estate taxes.

46.     After Yong attempted to make the payment, a Will County representative notified Yong that payment for the first installment of the 2013 real estate taxes was already paid by Ocwen.

47.     Yong explained to the Will County representative that Ocwen should not have made the payment because the loan is not escrowed and that Plaintiffs are responsible for making the real estate payments.

48.     Consistent with the terms of the subject loan, Yong tendered payment in the amount of $5,111.75 for the first installment of the 2013 real estate taxes to the Will County representative.

49.     Moreover, Yong authorized the Will County representative to issue a refund to Ocwen for the amount that Ocwen erroneously paid.

50.     In July 2014, Ocwen sent Plaintiffs a correspondence alleging that Plaintiffs missed a payment on the subject loan.

51.     Starting in July 2014, Ocwen began placing daily collection calls to Taemy's cellular phone seeking payment on the subject loan, which was at all times contractually current.

52.     On July 21, 2014, Plaintiffs sent Ocwen a correspondence (1) disputing that the subject loan was in default and (2) requesting that Ocwen close the erroneously opened escrow account.

53.     To support their contention that the subject loan was current, Plaintiffs' correspondence included a cancelled check for the payment that Ocwen alleges was not made ("disputed payment").

54.     On July 28, 2014, Ocwen responded to Plaintiffs' July 21, 2014 correspondence.

55.     In its response, Ocwen acknowledged receipt of the disputed payment but contended that the payment was applied to a preceding month because the subject loan was in default.

56.     Ocwen's response further stated that Ocwen could not close the escrow account because the subject loan has "a negative escrow balance of $5,110.88, late charges of $311.80, and expenses of $70.50."

57.     On August 6, 2014, Plaintiffs faxed a letter to Ocwen responding to Ocwen's July 28, 2014 correspondence.

58.     Plaintiff's letter disputed Ocwen's contention that the subject loan was in default and included proof of payments to Ocwen that established that Plaintiffs were current on the subject loan.

59.     Moreover, the letter notified Ocwen yet again that the escrow account was opened in error and requested that Ocwen close the escrow account. To support their contention that the escrow account was erroneously opened, Plaintiffs' letter included a copy of the check that Plaintiffs tendered to Will County for the real estate taxes.

60.     On August 15, 2014, unbeknownst to Plaintiffs, Ocwen paid the second installment of the 2013 real estate taxes in the amount of $5,111.75 to Will County, weeks prior to the due date.

61.     Again, Ocwen failed to notify Plaintiffs that it paid the second installment of the 2013 real estate taxes to Will County.

62.     On August 29, 2014, Plaintiffs timely paid the second installment of the 2013 real estate taxes in the amount of $5,111.75 to Will County.

7

63.    On or about September 12, 2014, Will County issued a refund check to Ocwen due to the double payment for the first installment of the 2013 real estate taxes.

64.    Despite receiving a refund, Ocwen did not properly credit the refund to the subject loan and instead continued sending Plaintiffs correspondences alleging that the subject loan was in default and threatening foreclosure.

65.    On October 10, 2014, Ocwen sent Plaintiffs a correspondence responding to Plaintiffs' August 6, 2014 letter.

66.    Ocwen's response acknowledged that a duplicate real estate tax payment was made and acknowledged that it received a refund check for the duplicate payment from Will County.

67.    Ocwen's response further stated that although it received the refund from Will County, the refund was "applied towards the escrow account" and that Ocwen cannot close the escrow account because the subject loan has "a negative escrow balance in the amount of $4,999.18."

68.    As demonstrated by Ocwen's response, Ocwen simply failed to adequately investigate Plaintiffs' grievances and correct the errors in its records.

69.    As a result of the alleged default, Ocwen continued placing daily collection calls to Taemy's cellular phone and sending correspondences to Plaintiffs alleging that the subject loan was in default and threatening to foreclose on the subject property.

70.    On March 14, 2015, feeling stressed and overwhelmed by Ocwen's harassment, Taemy admitted herself into the hospital after experiencing chest pains and elevated blood pressure.

71.    Taemy was subsequently diagnosed with acute hypertension and has been on medication for her blood pressure since that visit.

72.    Ocwen's relentless collections calls and dunning correspondences instantaneously spiked Taemy's blood pressure, triggered chest pains, and caused Taemy intense anxiety.

73.    On March 19, 2015, as a result of the double payment of the second installment of the 2013 real estate taxes, Will County issued a refund check to Ocwen in the amount of $5,111.75.

74.    On May 16, 2015, Plaintiffs attended a loss mitigation seminar held by Ocwen in Chicago, Illinois. The seminar was designed for struggling homeowners who have fallen behind on their mortgage payments.

75.    At the seminar, Plaintiffs met face to face with Roger Braggs, Ocwen's Regional Manager.

76.    Plaintiffs notified Roger Braggs of the issues that they have been having with Ocwen, namely the erroneous opening of the escrow account which largely triggered Ocwen's relentless collection activity.

77.    Plaintiffs provided Roger Braggs with documentation that established that the escrow account was opened in error and that the subject loan is in fact current.

78.    Roger Braggs assured Plaintiffs that Ocwen would investigate Plaintiffs' grievances and that Ocwen would correct any errors within three (3) weeks.

79.    Despite Roger Braggs' assurances that Ocwen would investigate Plaintiffs' grievances and correct its errors, Ocwen continued to ignore Plaintiffs' grievances and continued treating the subject loan as if it was in default and threatening foreclosure via collection calls and written correspondences.

80.    On May 29, 2015, Plaintiffs paid the first installment of the 2014 real estate taxes in the amount of $5,188.72 to Will County.

81.     On June 11, 2015, Ocwen sent a correspondence to Plaintiffs regarding Plaintiffs' grievances pertaining to the escrow account.

82.     Ocwen's correspondence acknowledged that Ocwen "incorrectly" added an escrow account on the subject loan. Moreover, the correspondence stated that that the escrow account was "removed on June 2, 2015" and that Ocwen "sincerely regret[s] any inconvenience [Plaintiffs] may have experienced in regard to the escrow account."

83.     Despite acknowledging that the escrow account was opened in error, Ocwen's correspondence stated that Ocwen has yet to receive a tax refund from Will County and that it cannot "adjust" the subject loan until it receives the refund. As a result, Ocwen maintained that the subject loan was in default and "currently due for March 1, 2015."

84.     Accordingly, Ocwen continued to deem the subject loan in default and continued its collection efforts, which included but were not limited to (1) never-ending collection phone calls; (2) systematic rejection of monthly mortgage payments tendered by Plaintiffs; and (3) never-ending collection letters sent to Plaintiffs' home.

85.     On September 11, 2015, Plaintiffs received a correspondence from The Wirbicki Law Group, LLC ("Wirbicki") regarding the default on the subject loan.

86.     The correspondence from Wirbicki stated that Ocwen had referred the subject loan to Wirbicki for foreclosure proceedings and demanded payment in the amount of **$305,658.26.**

87.     On September 17, 2015, Plaintiffs sent a correspondence to Wirbicki explaining, in detail, that the subject loan was not in default and that Ocwen continues to mishandle the subject loan.

88.     Plaintiffs' correspondence to Wirbicki further stated, in pertinent part:

a.     "We have been receiving calls 2 and 3 times a day, daily harassing us to pay the late charges."

b.     Ocwen's mishandling of the subject loan "has been so horrifying that Taemy had to go to the hospital thinking she was having a heart attack due to all the stress   that [Ocwen was] putting on her. [Taemy] spent 4 days in the hospital recovering."

c.     "We are an elderly Asian couple who never was late on a payment our entire life until Ocwen decided to mistreat us and make false accusations. We are going to the State Attorney Lisa Madigan and filing our claim now."

89.     True to their word, on September 17, 2015, Plaintiffs submitted a "consumer complaint" to the Illinois Attorney General complaining of Ocwen's chronic mishandling of the subject loan.

90.     On November 4, 2015, Ocwen, through Wirbicki, filed a foreclosure complaint in the Circuit Court of Will County against Plaintiffs and the subject property seeking to collect on the subject loan through a forced liquidation of the subject property ("foreclosure case").

91.     At the time Ocwen filed the foreclosure complaint, Plaintiffs were current on the subject loan as Plaintiffs never missed a payment on the subject loan.

92.     On November 8, 2015, Plaintiffs were served with the foreclosure complaint.

93.     Plaintiffs were served with the foreclosure complaint in plain view and Plaintiffs' neighbors witnessed Plaintiffs being served, which was a profoundly humiliating experience for Plaintiffs.

94.     The foreclosure complaint contained an affidavit that stated "Ocwen acquired the servicing rights for [the subject loan] on 4/17/2013 from Homeward Residential, Inc." and that

"**[a]t the time of this transfer, the [subject loan] was $322,501.60 in default for principal**." (emphasis added)

95.     On November 19, 2015, the Illinois Attorney General sent a correspondence to Ocwen and enclosed a copy of Plaintiffs' complaint against Ocwen submitted by Plaintiffs to the Illinois Attorney General.

96.     On November 24, 2015, Plaintiffs retained counsel to defend the foreclosure case, incurring attorney's fees.

97.     On December 3, 2015, Ocwen sent a correspondence to Plaintiffs acknowledging receipt of the complaint from the Illinois Attorney General. The correspondence further stated "[w]e are continuing to investigate your concerns and will need additional time to gather all the necessary information required to assist in resolving your complaint."

98.     Ocwen did not halt the foreclosure case as it was investigating Plaintiffs' complaint to the Illinois Attorney General.

99.     On December 17, 2015, Ocwen submitted a response to the Illinois Attorney General regarding Plaintiffs' complaint.

100.    Ocwen's response stated, in pertinent part:

    i. "[a]ccording to Ocwen's records, an escrow account was incorrectly added to the account effective with the July 1, 2013 installment."

    ii. "Ocwen's records further indicate, this matter was escalated wherein a request for the escrow account to be removed was submitted. The escrow requirement was removed on June 2, 2015. On behalf of Ocwen, we sincerely regret any inconvenience you may have experienced in regard to the escrow account."

101.    Despite acknowledging its errors in its response to the Illinois Attorney Gener]al, Ocwen's response astonishingly and inexplicably still maintained that the subject loan was in default.

102.    As stated above, it was a factual impossibility for the subject loan to be in default because (1) Plaintiffs made every contractual payment that became due on the subject loan and (2) paid all the real estate taxes that became due.

103.    Consistent with Ocwen's erroneous contention that that the subject loan was in default, Ocwen recklessly proceeded with the foreclosure case.

104.    On January 15, 2016, Plaintiffs, through their counsel, sent a letter to Wirbicki explaining that the subject loan was current and providing proof of payments on the subject loan and real estate taxes. The letter further requested that Ocwen "cease telephone contact with [Plaintiffs] as it is causing [Plaintiffs] horrendous stress" and that Plaintiffs "have made this request to representatives of Ocwen on several occasions in the past."

105.    Despite receiving irrefutable evidence that the subject loan was current, Ocwen continued (1) rejecting Plaintiffs' monthly payments; (2) prosecuting the foreclosure case; (3) placing harassing collection calls to Plaintiffs; and (4) sending collection letters to Plaintiffs.

106.    In some of the phone calls that Plaintiffs answered, Ocwen representatives recommended that Plaintiffs refinance the subject loan to avoid losing their home.

107.    On January 20, 2016, Ocwen sent Plaintiffs a correspondence stating that the amount needed to bring the subject loan current was $15,163.70. The correspondence further stated "[t]his amount includes payments, late fees, and any amounts we paid directly as servicer for the loan."

108.    On April 28, 2016, Ocwen, through Wirbicki, filed a Motion in the foreclosure case seeking an Order of Judgment, Order Appointing Selling Officer, and Judgment of Foreclosure and Sale.

109.    On May 31, 2016, Plaintiffs, through their counsel, filed a Motion to Dismiss the foreclosure complaint ("Plaintiffs' Motion to Dismiss").

110.    Plaintiffs' Motion to Dismiss contended that the subject loan was current and that the foreclosure case amounted to a wrongful foreclosure; thus notifying Ocwen yet again of its gross mishandling of the subject loan.

111.    Plaintiffs' Motion to Dismiss attached proof of payments, again providing proof that the subject loan was current.

112.    Ocwen did not dismiss the foreclosure case in response to Plaintiffs' Motion to Dismiss and instead continued its collection efforts on the subject loan.

113.    On October 24, 2017, Ocwen sent Plaintiffs a correspondence stating "**[w]e have not received your 12/01/2015 through 10/01/2017 mortgage payment(s).**" (emphasis in original)

114.    Ocwen's allegation that it did not receive Plaintiffs' mortgage payments from 12/01/2015 through 10/01/2017 was patently false because Plaintiffs made every payment that became due from 12/01/2015 through 10/01/02017.

115.    On December 22, 2017, Ocwen sent Plaintiffs a correspondence stating that Plaintiffs needed to pay **$49,352.06** by 01/12/2018 to bring the subject loan current. (emphasis in original)

116.    On January 12, 2018, over two years after it filed the foreclosure case, Ocwen finally voluntarily dismissed the foreclosure case.

117.    On January 16, 2018, February 9, 2018, May 9, 2018, June 7, 2018, and July 10, 2018, in response to payments made by Plaintiffs, Ocwen sent Plaintiffs correspondences stating "[t]hese funds are being returned, as they are not sufficient to satisfy the defaulted amount of your loan and no alternative payment arrangements have been agreed to." All the correspondences contained the checks that Plaintiffs sent for the respective month(s).

118.    The correspondences further stated that "payments that are less than the amount required to reinstate the mortgage loan will be returned and **will not stop any foreclosure proceedings that have begun**." (emphasis in originals)

119.    Moreover, Ocwen ceased sending Plaintiffs monthly mortgage statements, thus exacerbating Plaintiffs' confusion regarding the status of the subject loan as Plaintiffs were unable to determine the amount needed to cure the alleged default.

120.    Despite the fact that Ocwen ceased sending monthly mortgage statements, Plaintiffs continued to make timely payments on the subject loan each month.

121.    Up to the date this case was filed, Plaintiffs made every payment that became due on the subject loan.

122.    Up to the date this case was filed, Ocwen was inexplicably rejecting Plaintiffs' payments despite the fact that Plaintiffs were contractually current on the subject loan.

123.    On May 8, 2018, Ocwen sent Plaintiffs a correspondence stating that Plaintiffs needed to pay **$57,972.04** by June 1, 2018 to cure the default on the subject loan. (emphasis in original)

124.    The correspondence revealed that Ocwen was seeking to collect, *inter alia,* the following fees from Plaintiffs:

        a.    $311.80 for late fees;

15

b.     $515.75 for "property inspection fees";

c.     $5,106.50 for costs associated to the foreclosure filing;

d.     $2,380.00 for attorney's fees incurred for the foreclosure case.

### Ocwen's Collection Calls to Plaintiffs

125.    At all times relevant, Taemy was the subscriber, owner, possessor, and operator of a cellular telephone with the assigned number ending in 8778. Taemy is and has always been financially responsible for her cellular phone and its services.

126.    As stated above, in 2014, Ocwen began placing collection calls to Taemy erroneously alleging that the subject loan was in default and seeking payment to cure the default.

127.    Immediately after the collection calls began, Plaintiffs advised Ocwen that they were current on the subject loan and demanded that Ocwen cease all collection calls to Taemy's cellular phone.

128.    Notwithstanding Plaintiffs' repeated demands that Ocwen cease its collection calls, Ocwen placed collection calls to Taemy's cellular phone from 2014 through March 2016.

129.    Throughout that period, Plaintiffs answered no less 35 phone calls, and in most of the answered phone calls, Plaintiffs requested that Ocwen's phone calls cease.

130.    Plaintiffs' requests that Ocwen's phone calls cease fell on deaf ears and Ocwen continued its phone harassment campaign.

131.    Despite Plaintiffs' repeated requests that the calls cease, Ocwen placed or caused to be placed no less than 500 phone calls to Taemy's cellular phone from 2014 through March 2016, up to 4 times per day, in an attempt to collect on the subject loan.

132.     During the calls that Plaintiffs answered, Plaintiffs were greeted by a noticeable period of "dead air" while Ocwen's telephone system attempted to connect the Plaintiffs to a live telephone agent.

## DAMAGES

133.     Plaintiffs are an elderly couple that have lived a happy and fulfilling life until Ocwen entered their lives.

134.     Prior to Ocwen entering Plaintiffs' lives, Plaintiffs were healthy individuals that had no prior serious medical conditions.

135.     Ocwen's conduct has caused Plaintiffs agonizing emotional distress and mental anguish from the fear and anxiety arising from the imminent threat of losing their home.

136.     As stated above, Ocwen repeatedly threatened foreclosure and actually lived up to its threat and filed a foreclosure case in an effort to steal Plaintiffs' home.

137.     As stated above, on March 14, 2015, feeling stressed and overwhelmed by Ocwen's harassment, Taemy admitted herself into the hospital after experiencing chest pains and elevated blood pressure.

138.     Taemy was subsequently diagnosed with acute hypertension and anxiety and has been on medication for blood pressure and anxiety since her March 2015 hospitalization.

139.     Taemy's symptoms associated with her hypertension and anxiety are instantaneously triggered and exacerbated each time she hears the word "Ocwen."

140.     Taemy has incurred and continues to incur medical expenses as a direct result of Ocwen's conduct.

141.     Moreover, Ocwen's conduct has destroyed Plaintiffs' marriage as Ocwen's harassing conduct has caused Plaintiffs to be perpetually stressed, irritable, and aggravated, thus adversely affecting Plaintiffs' day-to-day relations with each other.

142.     Ocwen's conduct has severely disrupted Plaintiffs' daily lives and general well-being.

143.     Plaintiffs have been harassed and abused by Ocwen's unlawful attempts to collect on the subject loan for over five years.

144.     Plaintiffs have suffered and continue to suffer emotional distress, depression, mental anguish, and extreme anxiety as a direct result of Ocwen's conduct.

145.     Plaintiffs have incurred legal fees as a direct result of Ocwen's conduct. Specifically, Plaintiffs were forced to retain counsel to defend the foreclosure case and file the instant case.

146.     Moreover, Ocwen's conduct has resulted in a loss of equity in Plaintiffs' home. Specifically, Ocwen continues to charge the subject loan (1) late fees, (2) inspection fees, (3) legal fees and (4) other fees associated with defaulted loans. The imposition of the fees increases the balance of the subject loan, thus decreasing Plaintiffs' equity in their home.

147.     Plaintiffs have also been forced to pay fees to their homeowner's association as a result of Ocwen's conduct. Specifically, Plaintiffs have paid hundreds of dollars to their homeowner's association to reimburse the homeowner's association for fees incurred by the homeowner's association to "monitor" the foreclosure case.

148.     Plaintiffs have also been denied credit as a result of Ocwen's conduct. Specifically, during the relevant time period, Ocwen falsely reported the subject loan as in default to the credit reporting agencies, thus adversely impacting Plaintiffs' credit worthiness.

149.    Plaintiffs have lost thousands of hours dealing with Ocwen's mishandling of the subject loan.

150.    Plaintiffs continue to leave in perpetual fear and anxiety of losing their home because Ocwen continues to reject Plaintiffs' mortgage payments.

151.    Ocwen's continuous rejection of payments forced Plaintiffs to send each monthly payment via certified mail to ensure that Ocwen was in fact receiving the monthly payments. As a result, Plaintiffs have incurred hundreds of dollars in certified mailing expenses as a result of Ocwen's rejection of payments.

152.    Plaintiffs have also incurred travel expenses as a result of Ocwen's conduct. Specifically, Plaintiffs had to travel to Chicago, Illinois to meet with Roger Braggs in an effort to resolve their dispute with Ocwen.

153.    Moreover, Ocwen's phone harassment campaign was highly aggravating and stressful and caused Plaintiffs actual harm, including but not limited to, invasion of privacy, intrusion upon seclusion, trespass to chattels, increased risk of personal injury due to the distraction caused by Ocwen's incessant phone calls, loss of use of Taemy's cellular phone, and decreased battery life on Taemy's cellular phone.

154.    In June 2018, Taemy was again hospitalized for chest pains and dizziness, symptoms that are associated with her hypertension and anxiety conditions, which were caused by Ocwen's egregious conduct.

155.    Plaintiffs were forced to bring this action to compel Ocwen to cease its unlawful conduct.

## COUNT I – BREACH OF CONTRACT

156.     Plaintiffs restate Paragraphs 1 through 155 as fully stated herein.

157.     The subject loan/mortgage is a valid and enforceable contract between Plaintiffs and WAMU and its successors and assigns ("the contract").

158.     Ocwen is a successor and assign of the subject loan and mortgage, and thus Ocwen is bound by the terms of the contract.

159.     Under Illinois law, every contract implies a covenant of good faith and fair dealing.

160.     Plaintiffs performed their duties under the contract by tendering all monthly payments to Ocwen and by complying with all of the other terms of the contract.

161.     Ocwen materially breached the contract and its implied duty of good faith and fair dealing by:

    a.  rejecting Plaintiffs' timely payments;

    b.  deeming the subject loan in default when it was current;

    c.  imposing an escrow account without contractual or legal authorization and increasing the monthly payment amount;

    d.  failing to close the escrow account after it admitted it was opened in error;

    e.  reporting false derogatory information on Plaintiffs' credit reports;

    f.  misapplying Plaintiffs' payments by holding the payments in suspense and not timely applying the payments per the terms of the subject loan and mortgage;

    g.  charging unauthorized fees and costs (late fees, inspection fees, legal fees, etc.) not permitted by the contract, or state or federal law;

    h.  failing to provide accurate reinstatement figures;

20

    i.  filing a wrongful foreclosure;

    j.  failing to investigate Plaintiffs' disputes;

    k.  failing to adequately respond to Plaintiffs' disputes;

    l.  perpetually failing to correct its records;

    m.  failing to conduct its affairs in good faith; and

    n.  failing to dismiss the foreclosure case after it was put on notice that Plaintiffs have complied with all terms of the subject loan and mortgage.

162.    As stated above, Ocwen's breach of contract has caused Plaintiffs significant economic and non-economic damages.

163.    Moreover, Plaintiffs are entitled to punitive damages for Ocwen's breach of contract because Ocwen's conduct resulted in willful torts (intentional infliction of emotional distress) accompanied by "wantonness" and "oppression." *See Hunter Douglas Metals, Inc. v. Edward C. Mange Trading Co.*, 586 F. Supp. 926, 929 (7th Cir. 1984) (finding that where a breach of contract contains allegations sufficient to support both a contract claim and an independent tort, both may stand and punitive damages may be awarded if plaintiff is able to sustain his burden under the tort theory.)

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court:

    a.  Find that Ocwen materially breached the contract;

    b.  Award Plaintiffs their actual damages, in excess of $75,000;

    c.  Award Plaintiffs punitive damages; and

    d.  Award Plaintiffs any other relief this Honorable Court deems equitable and just.

## COUNT II – VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

164.    Plaintiffs restate Paragraphs 1 through 155 as fully stated herein.

165.    The subject loan is a "debt" as defined by the FDCPA §1692a(5) because the mortgage loan was incurred to finance the purchase of Plaintiffs' principal residence, and thus incurred for "personal, family, or household" purposes.

166.    Ocwen is a "debt collector" as defined by the FDCPA §1692a(6) because it uses instrumentalities of interstate commerce or the mails to collect debts and enforce security interests.

167.    Ocwen is a "debt collector" as defined by the FDCPA §1692a(6) because its principal business purpose is the collection of debts.

168.    Ocwen is a "debt collector" as defined by the FDCPA §1692a(6) because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

169.    Ocwen and Homeward are "debt collectors" as defined by the FDCPA §1692a(6) because they treated the subject loan as in default as soon as they acquired the subject loan.

170.    At all times relevant, Ocwen was attempting to collect a debt allegedly owed by the Plaintiffs (past due amounts, etc.)

171.    Ocwen violated 15 U.S.C. §§1692d, 1692e, 1692e(2), 1692e(5), 1692e(10), 1692f, 1692f(1), 1692f(5), and 1692c(a)(2).

a.    **Violations of §1692d**

172.    Ocwen violated §1692d by engaging in abusive and oppressive conduct towards Plaintiffs by (1) relentlessly attempting to collect fictitious past due amounts and fees from Plaintiffs; (2) rejecting Plaintiffs' payments and then alleging Plaintiffs failed to make payments; (3) disregarding Plaintiffs' repeated requests to close the erroneously opened escrow account; (4)

22

representing to Plaintiffs that Ocwen's errors will be corrected when Ocwen had no intention of correcting its errors; (5) filing the foreclosure case when the subject loan was current; (6) continuing the foreclosure case after Ocwen received indisputable proof that the subject loan was current; and (7) forcing Plaintiffs to defend the foreclosure case until January 2018.

       **b.**       **Violations of §1692e, e(2), e(5), e(8), and e(10)**

173.      Ocwen violated §§1692e, e(2), e(5), and e(10) by falsely representing to Plaintiffs that the subject loan was in default when in fact that the subject loan was current.

174.      Ocwen violated §§1692e, e(2), e(5), and e(10) by continuously rejecting Plaintiffs' payments under the false pretense that the payments were insufficient to cure the fictitious default.

175.      Ocwen violated §§1692e, e(2), e(5), and e(10) by misrepresenting the amount of the alleged debt owed by Plaintiffs. Specifically, Ocwen continuously inflated the amounts owed by Plaintiffs on the subject loan by demanding payment on fictitious past due amounts, late charges, inspection fees, and amounts needed to fund the unauthorized escrow account.

176.      Ocwen violated §§1692e, e(2), e(5), and e(10) by misleading Plaintiffs into believing that a new foreclosure case has been filed (*see e.g.* Paragraph 117). Ocwen's false and misleading representations were made after the foreclosure case was dismissed. Accordingly, the representations were false in the sense that no foreclosure was pending at the time Ocwen sent the correspondences.

177.      Ocwen violated §1692e(5) by taking an action that cannot be legally taken by filing the foreclosure case and continuing to prosecute it through January 2018.

178.      Ocwen violated §1692e(8) by falsely reporting the subject loan as in default to the credit reporting agencies when it knew or should have known that the subject loan was contractually current.

179.    Ocwen's attempts to collect the subject debt by way of foreclosure, perpetually declaring the subject loan in default, and establishing an erroneous escrow account represents false, deceptive, and misleading conduct in violation of §1692e of the FDCPA.

c.    **Violations of §1692f, f(1), and f(5**

180.    Ocwen violated §1692f by employing unfair and unconscionable means to collect the subject loan.

181.    Ocwen violated §1692f(1) by attempting to collect amounts not authorized by the terms of the subject loan by attempting to collect fictitious/unauthorized past due amounts, late charges, inspection fees, and amounts needed to fund the unauthorized escrow account. The collection of these amounts is only authorized if the subject loan is in default. As stated above, the subject loan was always current, thus any attempt to collect the aforementioned amounts was not authorized by the subject loan or applicable state and federal laws.

182.    Ocwen violated §1692f(5) by causing unauthorized charges to be made to the subject loan and in turn to the Plaintiffs directly.

d.    **Violations of §1692c(a)(2)**

183.    Ocwen violated §1692c(a)(2) by communicating with Plaintiffs after it knew that Plaintiffs were represented by counsel. Specifically, Ocwen continued to send collection correspondences to Plaintiffs after Ocwen knew that Plaintiffs were represented by counsel with respect to the subject loan. As stated above, Ocwen obtained knowledge that Plaintiffs were represented by counsel after Plaintiffs' counsel filed an appearance in the foreclosure case and sent a correspondence to Ocwen's counsel on January 15, 2016 disputing the alleged default.

184.    As stated above, Plaintiffs were significantly harmed by Ocwen's conduct.

**WHEREFORE,** Plaintiffs request that this Honorable Court:

    a. Declare that Ocwen's conduct was unlawful and in violation of the FDCPA;

    b. Award Plaintiffs statutory damages and actual damages, in excess of $75,000;

    c. Award Plaintiffs their costs and reasonable attorney's fees; and

    d. Award any other relief as this Honorable Court deems just and appropriate.

## COUNT III – VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFA")

185. Plaintiffs restate Paragraphs 1 through 155 as fully stated herein.

186. Plaintiffs meet the ICFA definition of "consumer" and "person."

187. Ocwen violated ICFA by employing unfair and deceptive acts and practices against Plaintiffs.

188. Ocwen specializes in mortgage lending, servicing, and debt collection.

189. These actions occur in the course of conduct involving trade or commerce.

**a.    Unfairness and Deception**

190. It was unfair and deceptive for Ocwen to treat the subject loan in default when it was current.

191. It was unfair and deceptive for Ocwen to repeateldy attempt to collect amounts it is not entitled to, including but not limited to, fictitious past due amounts, unauthorized late charges, unauthorized inspection fees, and other unauthorized charges.

192. It was unfair and deceptive for Ocwen to:

    a. attempt to collect amounts it was not contractually or legally entitled to;

    b. deem the subject loan in default when it was current;

    c. not apply Plaintiffs payments to the subject loan upon receipt;

d.  reject Plaintiffs' timely payments and then allege that Plaintiffs did not make timely payments;

e.  impose an escrow account without contractual or legal authorization and increasing the monthly mortgage payment amount;

f.  fail to close the escrow account once it acknowledged it was opened in error;

g.  report false derogatory information on Plaintiffs' credit reports;

h.  misapply Plaintiffs' payments by holding the payments in suspense and not applying the payments per the terms of the subject loan and mortgage;

i.  charge unauthorized fees and costs (late fees, inspection fees, legal fees, etc.) not permitted by the contract, or applicable state and federal laws;

j.  place hundreds of collection calls to Plaintiffs after Plaintiffs requested that the calls cease;

k.  fail to provide accurate reinstatement figures upon request from Plaintiffs;

l.  file a wrongful foreclosure after Ocwen's Regional Manager, Roger Braggs acknowledged Ocwen's error and represented to Plaintiffs that Ocwen would correct its records;

m.  force Plaintiffs to defend against a wrongful foreclosure;

n.  fail to investigate Plaintiffs' repeated disputes;

o.  fail to adequately respond to Plaintiffs' repeated disputes;

p.  perpetually fail to correct its records;

q.  falsely represent to Plaintiffs that it would correct the errors it committed when it had no intention of doing so;

r.   make false representations to the Illinois Attorney General regarding the status of the subject loan;

s.   fail to conduct its affairs in good faith;

t.   wait over two years to dismiss the foreclosure case that it knew it had no basis to file; and

u.   continue to reject payments through the date the Plaintiffs initiated this action.

193.   Plaintiffs had no choice but to submit to Ocwen's abusive conduct for over five years.

194.   Ocwen intended for Plaintiffs to rely on their unfair and deceptive acts. Specifically, Ocwen's conduct was designed to force Plaintiffs to either pay the unauthorized charges to enrich Ocwen or in the alternative force Plaintiffs to simply hand their home to Ocwen.

195.   Ocwen's overall scheme, which has lasted for over five years, was designed to buffalo Plaintiffs into giving up their home despite the fact that Plaintiffs never missed a payment.

196.   Ocwen bullied Plaintiffs into near submission with perpetual unfair and deceptive conduct through lies, harassment, intimidation, and deception regarding the non-existent default on the subject loan.

197.   Ocwen's overall conduct towards Plaintiffs was oppressive and against public policy.

198.   As pled above, Plaintiffs were significantly harmed by Ocwen's conduct.

199.   Ocwen's conduct causes substantial injury to consumers generally because:

a.   consumers reasonably expect their mortgage companies to accept their payments and promptly apply them to the mortgage loan;

b.   consumers reasonably expect their mortgage companies to communicate with them truthfully and accurately regarding the status of their loans;

c.   consumers reasonably expect mortgage companies to investigate their disputes/grievances in good faith;

d.   consumers reasonably expect mortgage companies to make honest efforts to resolve a dispute, instead of misrepresenting facts and ignoring requests and inquiries;

e.   consumers reasonably expect that mortgage companies will not take illegal action to bully consumers into giving up their homes;

f.   consumer reasonably expect that mortgage companies will not file erroneous foreclosure actions to collect mortgage loans that are contractually current;

g.   consumers reasonably expect mortgage companies to comply with laws designed to protect consumers; and

h.   consumers reasonably expect mortgage companies to follow state and federal law and their own guidelines.

200.   Ocwen's conduct as described above is part of a pattern and practice in which Ocwen routinely engages in as part of its business model.

201.   Specifically, Ocwen has been repeatedly sued by State Attorney Generals across the United States for engaging in conduct similar to the conduct complained of herein.

202.   Ocwen mistreats consumers on a wide scale and its unlawful conduct has been highly publicized and condemned.

203.   Despite hundreds of lawsuits filed by consumers and State Attorney Generals, Ocwen brazenly continues to mistreat consumers nationwide.

204. Accordingly, an award of punitive damages is appropriate because Ocwen's conduct towards Plaintiffs and consumers generally is willful, wanton, and shows a reckless disregard for the rights of Plaintiffs and consumers in Illinois.

205. Additionally, an award of punitive damages is appropriate to deter Ocwen from future misconduct.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court:

    a. Enter judgment in Plaintiffs' favor and against Ocwen;

    b. Award Plaintiffs their actual damages, in excess of $75,000;

    c. Award Plaintiffs punitive damages;

    d. Award Plaintiffs their reasonably attorney's fees and costs; and

    e. Award Plaintiffs any other relief this Honorable Court deems equitable and just.

## <u>COUNT IV – VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT</u>

206. Plaintiffs restate and reallege paragraphs 1 through 155 as though fully set forth herein.

207. At all times relevant, Taemy was the subscriber and possessor of the cellular telephone with the assigned number ending in 8778. Taemy is and has always been financially responsible for her cellular phone and its services.

208. Although Taemy was the primary possessor of her cellular phone, Yong occasionally possessed Taemy's cellular phone when Ocwen called.

209. The TCPA prohibits calling persons on their cellular phone using an automatic telephone dialing system ("ATDS") without their consent. 47 U.S.C. §227(b)(1)(iii).

210.    The TCPA defines ATDS as "equipment which has the capacity...to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. §227(a)(1).

211.    Upon information and belief, based on the pause and lack of prompt human response during the phone calls in which Plaintiffs answered, Ocwen used an ATDS to place calls to Taemy's cellular phone.

212.    Upon information and belief, the ATDS employed by Ocwen transfers the call to a live agent once the human voice is detected, thus resulting in a pause after the called party speaks into the phone.

213.    Ocwen violated the TCPA by placing no less than 500 non-emergency calls to Taemy's cellular phone using an ATDS without Taemy's consent.

214.    Any prior consent, if any, was revoked during the phone calls Plaintiffs answered.

215.    In total, Plaintiffs verbally revoked consent on no less than twenty (20) occasions during the calls Plaintiffs answered in the relevant time period.

216.    Moreover, Plaintiffs revoked consent in writing on no less than three (3) occasions through written correspondence to Ocwen and Ocwen's counsel.

217.    As pled above, Plaintiffs were significantly harmed by Ocwen's collection calls to Taemy's cellular phone.

218.    Pursuant to 47 U.S.C. §227(b)(3)(B), Ocwen is liable to Plaintiffs for at least $500.00 per call.

219.    Moreover, pursuant to 47 U.S.C. §227(b)(3)(C), Ocwen's willful and intentional violation of the TCPA triggers this Honorable Court's authority to triple the damages to which Plaintiffs are otherwise entitled to under 47 U.S.C. §227(b)(3)(C).

**WHEREFORE**, Plaintiffs request that this Honorable Court:

    a. Declare Ocwen's phone calls to Taemy's cellular phone to be violations of the TCPA;

    b. Enjoin Ocwen from placing any further calls to Plaintiffs;

    c. Award Plaintiffs damages of $1,500.00 per phone call for Ocwen's willful violations of 47 U.S.C. §227(b)(3)(B)&(C); and

    d. Award any other relief this Honorable Court deems equitable and just.

## COUNT V– INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

220.    Plaintiffs restate Paragraphs 1 through 155 as fully stated herein.

221.    To state a claim for intentional infliction of emotional distress, a plaintiff must establish that (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that its conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress. *Honaker v. Smith,* 256 F.3d 477, 490 (7th Cir. 2001).

222.    Ocwen's conduct as described above was extreme, outrageous, went beyond all possible bounds of decency, and is intolerable in a civilized community.

223.    Ocwen has abused and tormented the Plaintiffs for over five years and continues to do so until Plaintiffs filed the instant action.

224.    Ocwen's conduct taken as a whole is egregious and offensive by any objective standard.

225.    Plaintiffs, an elderly Korean couple that speak very limited English, are especially vulnerable individuals.

226.    Ocwen's attempt to literally steal the Plaintiffs' home was despicable and appalling.

227.    Ocwen knew that its conduct towards Plaintiffs would inflict severe emotional distress on Plaintiffs.

228.    As described above, Ocwen's conduct has destroyed Plaintiffs' lives and was the proximate cause of Taemy's hypertension and anxiety diagnosis.

229.    In the alternative, Ocwen is liable for negligent infliction of emotional distress.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court:

a.    Enter judgment in Plaintiffs' favor and against Ocwen;

b.    Award Plaintiffs their actual damages, in excess of $75,000;

c.    Award Plaintiffs punitive damages; and

d.    Award Plaintiffs any other relief this Honorable Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: February 11, 2021                                 Respectfully Submitted,

                                                                        /s/ *Mohammed O. Badwan*

                                                                        Mohammed O. Badwan, Esq.
                                                                        *Counsel for Plaintiffs*
                                                                        Sulaiman Law Group, Ltd.
                                                                        2500 S. Highland Ave., Ste. 250
                                                                        Lombard, IL 60148
                                                                        Phone (630) 575-8180
                                                                        mbadwan@sulaimanlaw.com